Case numbers 13-2598 and 2599. United States of America v. Vishnu Meda and Mehran Javidan. Argument not to exceed 10 minutes for each defendant and 20 minutes for the plaintiff. Ms. Robinson and Mr. Edelstein for the appellants. Good morning. Good morning, your honors. And may it please the court, Brandy Robinson of the Federal Defender Office in Detroit, appearing on behalf of the defendant, Appellant Vishnu Meda. Would you like to reserve any rebuttal time? I would, your honor. Three minutes, please. When Vishnu Meda was first faced with charges that he had committed Medicare fraud conspiracy, he honestly thought this would involve one of the most difficult chapters in his life. What he didn't know was that within that same time frame that he was under a first set of indictments, the weight of a government prosecution would visit him again and subject him to jeopardy for the same charges, not only once but twice. This case is about how the government used its power to take two bites at the apple and ultimately succeeded in convicting Mr. Meda of a crime for which the jury had actually already acquitted him. There are five factors that guide this court's double jeopardy analysis. Those factors include the time period involved, the identity of the actors, the offense charged, the nature of the overt acts, and the location of the conspiracy. And what we have here is two concessions from the government on two of those points. One is that the charges pursued were exactly the same as they were. The second charge or the second concession from the government that I just want to take a moment to discuss involves the fact that the location of the conspiracies was the same. And this is a significant point because as the district court correctly found, all of the health care agencies at issue were located in the same building that the parties all agreed was essentially a house of fraud. This was a building that housed five different home health care agencies run by Muhammad Shahab, Acure, All American, Embrace, Patient Choice, and Care Plus, in addition to other co-conspirators who were involved in the Medicare fraud conspiracy. The fact that all of these companies were located in the same building is really relevant to an analysis of the third factor that favors Mr. Meda, and that is the identity of the actors involved. Essentially, all of the players between the two cases were the same. The patients were all brought into each of the companies upon referral from the same set of doctors. Those patients were also brought into each one of the companies using many of the same recruiters. And when the patients came into any one of the companies, they were funneled through using the same administrators at many of the companies. There came a point in time, I guess it was sometime in 2009, when Mr. Shahab was really not actively involved in Acure, more of an investor, and Ms. Javidan was really sort of the point person running Acure. So, you know, to some extent, or to a great extent, you really have two separate operations going here. The patient care and All American, on one hand, was run by Shahab, and really Acure, certainly starting in 2009, run by Ms. Javidan, if I'm correct. Well, Your Honor, what I would say in response to that is that while Ms. Javidan certainly ran the day-to-day operations beyond a certain point, Mr. Shahab never disappeared completely from having a role in the company. As you mentioned, he was instrumental in the creation of the company, so he worked to set up a partnership for Acure between Ms. Javidan and her husband. He trained Ms. Javidan using the patient choice model in terms of how the business at Acure should run. He actually had an investing role in Acure, as Your Honor indicated. And then when patients would discharge from patient choice in many of the other companies, he would arrange for those patients to then become patients at Acure. And the same thing was true for employees. Shahab was very instrumental in making sure that Ms. Javidan had all of the personnel that she needed at Acure, based on the personnel that was in existence at the other companies. And I think one of the most significant things is that Shahab was very clear that he was going to be the lone point of contact for incoming patients that were coming through Dr. Raval. And as we know, without the patients, the whole scheme falls apart. I would also direct the Court's attention to an exhibit that was part of the lower court record and cited in the reply brief as Exhibit 55, and its page ID number is 7192-7195. That exhibit really well illustrates the global nature that Shahab played in the scheme and the interconnected role that each of these companies had with one another. The pattern was really clear. The patients would be recruited into one company, and then once those patients were treated and discharged, a period of time would pass, and deliberately the patients would then be funneled through another company. And the whole point of that was so as to not alert Medicare that something improper was happening. Counsel, I wanted to ask you a question about the structure of the conspiracy. You talked a good bit about the place, it all occurred in one building, and the parties were about the same, but in terms of the time for this one global conspiracy that you mentioned, it appears that while there's some overlap, the times alleged in the indictment were not exactly congruent. And it also appears from looking at the record that, at least the way the government has crafted this, there were some common conspirators in each one of them, but they were not all the same. So I want you to talk about the time, because it seems to me that you could have two conspirators involved in the same people if, in fact, there were clear demarcations of time. Here there was some overlap, but the times are not congruent. They didn't expand the same period. So talk about that a bit. So the government has taken the position that the amount of overlap in time between the companies was only six months. And it's our position that that time period is artificially shortened. It actually is closer to ten months. And I'm not sure that the four-month difference really globally tilts in favor of one party or the other. What I would say is that under the totality of the circumstances, though, when you look at, and again that exhibit is very illustrative, when you look at the role that Shahab played and the way that these patients funneled from one agency to the next, it's very clear that Shahab was really the unifying force behind both the Acure conspiracy and the conspiracy, or I should say behind the scheme that was operating at Acure and the scheme that was prosecuted as part of the first case. I guess the same question comes up, though. Is that really the case after September 2009? I think Ms. Javidan ultimately received an enhancement for leadership or organized or something to that effect. It just appears that the record reflects that there came a point in time when arguably she was the driving force from September 2009 until that point in 2010 when allegedly that conspiracy ended. So, Your Honor, I would agree. There was certainly a point where because Shahab's ruse had been exposed essentially because of a raid that had happened, he kind of shut down and stopped participating actively. But I think to focus solely on how the mechanics of the operation were running after a certain time point really obscures the central analysis here, which is essentially the question of whether the key players involved were the same between the two entities. And because Shahab almost created the blueprint for the way this company ran, so the fact that he could step back at some point and not actively have to do things like watch bank accounts or arrange for patients to come in or make their way through a company in any particular way really does not undermine the fact that he was the mastermind behind how it was set up altogether. So when was the raid? The raid, you know what, Your Honor, I don't know the exact date of that offhand, but I can check. But I believe it was, you know what, I don't want to misstate the record. But there was definitely a point in time where once the raid happened, Shahab was not. And maybe you could check that for me. So were there charges brought at the time of the raid? Or did they just raid it and then later indict these people? Well, I think the raid happened first and then there was a period of time where operations were dormant, obviously at the companies that had been raided. A cure continued and then charges were initiated some time, some appreciable amount of time afterward. But what you're saying is that at some point they came in and, in effect, shut down Patient Choice and All American and let a cure continue to operate. Is that what happened? I believe that's correct. Okay. Okay. Your initial time has expired, but you'll have your full rebuttal. Thank you. Ms. Robinson, thank you. Good morning, Your Honors. May it please the Court, my name is Jonathan Edelstein. I represent the defendant, Mehran Javadan. There are a number of evidentiary issues in this case, and the one that I would like to talk about first is what I called in the brief conspirators in law, which are out-of-court declarations of people who conspired with the cooperating witness, Mahmoud Shahab, but who the government agrees were not co-conspirators with Ms. Javadan. Now, the government agrees in its brief that at least two of these statements were improperly admitted. As to some of the others, it argues that those statements may have involved Acure. The context I would submit as discussed in the reply brief shows that those statements did not involve Acure. In any event, it was the government's job to establish a foundation for these declarations, so ambiguities don't count in its favor, they count in Ms. Javadan's favor. And, in fact, the government also agrees that there were other instances of these so-called co-conspirator statements which were not actually co-conspirator statements being admitted other than the ones that were specifically objected to, and I would submit those were covered by Ms. Stanyard, Defense Counsel Stanyard's ongoing objection. So we have error here, we're really talking about harmlessness. And I think it's easy to say, as the government does, that this is a big case, no one thing made much of a difference, this didn't really move the needle one way or another. However, aside from the fact that numerous statements add up, I would submit that a critical issue here is that these objections to a couple of the statements were hashed out in front of the jury, and the status of these witnesses was discussed in front of the jury. We discussed those colloquies at pages 2 and 3 of the reply brief, it's page ID numbers 1594 and 1613, in which it's stated... Slow down just a minute, 1594 and 1613? Yes, Your Honor. Okay, thank you. In which the government states that these witnesses are co-conspirators, the court overrules the objection, and that's almost a judicial finding, and possibly in the eyes of the jury it was a judicial finding, that Ms. Javedan's conspiratorial activities didn't begin with Acure and they extended beyond Acure. And the issue in this case was whether Ms. Javedan knew that Acure was a fraud. This was a case, the government's case and the defense case were about equally long, the government said she was an active, knowing and willing participant, her witnesses said and her attorney argued that she was a dupe. Now, obviously if the jury was given the impression by being told that these witnesses were co-conspirator witnesses, if the jury was thereby given the impression that she was part of a conspiracy with Mr. Shahab before Acure, it wasn't limited to Acure, that would have a very powerful effect on whether the jury finds that she knew what she was doing at Acure or, on the other hand, whether she was a dupe. In that event, I don't believe that the government, I would submit that the government cannot meet its burden of proving that these admitted errors were harmless. Now, also, I know the government has argued in its brief that plain error review applies here. I would submit in light of the colloquies that were discussed at pages two and three of the reply brief that plain error does not apply here. That specific enough objections were made that it's quite clear that the government was objecting, that the defendants were objecting to the government's characterization of everyone who ever worked with Mr. Shahab as a co-conspirator. But even assuming the plain error review does apply, the error here was very plain under the Borgelli case and the fact that these objections were hashed out in front of the jury and the fact that these multiple statements were admitted means that it did affect Ms. Javidan's substantial rights and that the colloquies in front of the jury and the implication of those colloquies as conveyed to the jury did affect the fairness and justice of the proceedings. Now, going on to a second evidentiary issue, which is the proposed testimony of Sassan Koubiari. This is not, as the government contends, double hearsay. The proffer was that Mr. Koubiari would have testified to what he told Ms. Javidan regarding what he heard at the meeting. To the extent that he was talking about his own statements at a prior time, that's not hearsay and we have cases cited in the reply brief to show that. The only level of potential hearsay was what the attorney said at the meeting and that's not hearsay either because it wasn't admitted for its truth. The government, in fact, framed the issue as this testimony being offered to show what the attorney said at the meeting. That shows why it was not hearsay. Because if a statement was admitted simply for the fact that it was said and for its effect on the hearer, then that's not hearsay. This was not offered to show that the attorney's advice was true, that it was a correct statement of the law, that they were giving Mr. Koubiari the straight goods regarding how to hire marketers. It was just offered for the fact that this was said. Now, finally, the government is incorrect that this testimony would have been cumulative of Ms. Javidan's testimony because Ms. Javidan was not at the meeting. Mr. Koubiari is the only one who could directly rebut Mr. Shahab as to what happened at the meeting and as to what these attorneys were really giving advice about. And also the defendant was the defendant. Ms. Javidan was an interested witness and the jury was so instructed. So corroborating testimony from someone who would not have been given an interested witness instruction or been subject to an interested witness instruction is not cumulative under these circumstances. There's a qualitative difference between the proposed testimony from Mr. Koubiari about what he heard at the meeting and what was conveyed at the meeting and what he then conveyed to Ms. Javidan and Ms. Javidan's testimony at trial. And I would submit that for this and for the other reasons in the brief, that Ms. Javidan should receive a reversal. Since I'm out of time, I'll reserve for rebuttal now. Thank you, Your Honors. Good morning, Your Honors, and may it please the Court. Ross Goldman for the United States. I think I'll begin where a co-counsel left off, which is with respect to the proffered testimony of Ms. Javidan's husband, Mr. Koubiari. That evidence was offered for a hearsay purpose. It was offered to prove the truth of what was said at that meeting. And I think we know that because in her opening brief, Ms. Javidan says that this testimony was offered to prove, quote, the very fact that the advice was given or to rebut the testimony of Mr. Shahab or that Mr. Koubiari would testify that, quote, in fact attorneys gave this advice about how to pay marketers and because the jury would think differently, potentially, about Ms. Javidan's guilt if the jury knew that the meeting was focused on legal ways of paying marketers. So let's back up just a minute. Give me your interpretation of the statements that were made by the attorneys at the meeting. Just paraphrase it. What I understand, the government never put on evidence that attorneys were testifying at this meeting, but that was evidence that came through Ms. Javidan's case. Okay. And the assertion here was that the attorney said that you should start paying your marketers on an hourly basis for a collection of services. Again, here, the testimony that was- And was the government trying to prove that they were paid on an hourly basis for their recruiting? No. The reason that the government elicited testimony about this meeting from Mr. Shahab was because Mr. Shahab testified that, in fact, there were no attorneys at the meeting. Let me take that back. What Mr. Shahab testified to was that, at the meeting, the individuals involved, according to Mr. Shahab, Ms. Javidan was at the meeting, as was Mr. Koubiary, and that they were going to create fake marketer contracts, and marketers were going to create fake invoices to give the appearance that the companies, including Acura, was going to pay marketers on an hourly basis, but that, in fact, this was just going to be a fraud and the payments were going to be made on a per-patient basis. And they came back with testimony from the husband that you say was double hearsay. That's correct, Your Honor. And was it not, though, as counsel said, Mr. Edelstein, that the importance of it was the fact that it was said and not whether it was true or not? I think there's no question here, Your Honor, that it would have been permissible for Ms. Javidan to seek to use this testimony only to show what she thought after the meeting about what Acura was going to be doing with respect to payment practices. But that wouldn't go to show what, in fact, was said at the meeting, and it wouldn't go to show that Mr. Shahab's version of the meeting was wrong. And to see this, I think it's useful to just consider that if, in fact, what actually they discussed at the meeting was a baseball game. If they discussed a baseball game at the meeting, then the contents of the meeting wouldn't show the very fact that advice was given. It wouldn't rebut Mr. Shahab's testimony. It wouldn't show that it's true. But haven't you just now said what I'm trying to clear up? The importance was whether the advice was given and not what the advice was. Is that not true? I don't think – no, Your Honor. I think that makes it a hearsay purpose. With respect, what Ms. Javidan wanted here was Mr. Kubari to testify to what he told her that others told him at the meeting. If what Ms. Javidan is trying to do with this testimony, which we submit is, in fact, what she says she's trying to do, is to show what was said at the meeting, then what Mr. Kubari told Ms. Javidan was said at the meeting has to be true. His account of the meeting has to be true. Again, there's no question here that had all Ms. Javidan wanted to show was, I thought, my husband told me this is what we were doing, and Ms. Javidan was going to use that evidence to say I had an innocent state of mind. It doesn't matter what actually said at the meeting. It doesn't matter if the attorneys gave correct advice. It doesn't matter if the attorneys gave advice. This is what I was told. I offer this to prove no more. That would have been permissible, but that's not the argument that Ms. Javidan is making for why she thinks this testimony should have been admitted. In any event, even if this court were to conclude otherwise, it could do what it has done in other cases, which is to either, for example, not resolve the evidentiary question and simply hold that if there was error, any error would be harmless. We've offered three reasons why we think the error was, I think, very clearly harmless in this case. One is it was cumulative of Ms. Javidan's own testimony. Counsel for Ms. Javidan noted that Ms. Javidan was an interested witness, and so perhaps the jury would have been more persuaded by Mr. Koubiary's account of what happened at the meeting. Of course, that would be the same impermissible use of this testimony. But in any event, Mr. Koubiary himself was an interested witness. At one point during trial, he was asked if he was afraid that Ms. Javidan might seek jail time or might receive jail time, and he started crying on the witness stand, which I think suggests only that he himself had a motive to shade his testimony, which I think rebuts the notion here that he would have obviously been a more credible witness with respect to this meeting. I think the evidence is harmless because Ms. Javidan actually used this testimony for its truth at closing argument when she referred to this issue and said, we know from Mr. Koubiary's perspective what happened at the meeting. In fact, she called it something like a game of telephone. We know Mr. Koubiary's perspective. It conflicts with Mr. Shahab's. Mr. Koubiary's version is more credible. And it's cumulative because the government, over 73 pages of closing and rebuttal closing argument, referred to this meeting briefly twice. There was ample other evidence in the record, in fact, from before and after this February 2009 meeting that Ms. Javidan was knowingly paying marketers on a per-patient basis. Turning from that issue. I know that you argued that there was no error in the courts preventing Ms. Javidan's husband from testifying, but if the court finds that the district court improperly prevented the husband from testifying, does that basically suggest that we should reverse? I mean, was that a fundamental issue that impaired her right, her substantial rights? I'm sorry, with respect to Mr. Koubiary's proffer testimony or with respect to the court? There was an allegation that the court improperly prevented Ms. Javidan's husband from testifying, and that's what I'm asking about now. Right, and that was what I meant to have been addressing earlier. The reason why, if the court were to find error there, Your Honor, the reason why I think the error would be harmless is because it is, in our view, cumulative of Ms. Javidan's testimony, was actually used for, it's true, the very thing that she said she wanted to use this for, she did, and because this was a very small part of the government's case. It was not a focus of the government's closing and was outweighed. All right, and similarly, if we find that the district court didn't make the in-right findings, what should this court do about that? I mean, does that warrant remand? How should we consider that issue? I don't believe it will warrant a remand, Your Honor, and this is now moving to, obviously, the co-conspirator exception issue, and the district court did not, and we acknowledge this in our brief, did not make the in-right findings. That's not a structural error. That is something that gets reviewed either for plain or harmless error, just like most every other error, and I think it's important here to step back and to look. Ms. Javidan has identified five instances of alleged error with respect to the co-conspirator exception. One of these examples was not hearsay at all. It wasn't offered for its truth. It wasn't admitted for its truth. One of these examples was actually permissible under the co-conspirator exception. It was Mr. Shahab testifying to conversations he had with marketers about their work at Acure, and so although the district court didn't make a specific in-right finding there, the district court had substantial familiarity with this case, and I think the evidence would clearly show, and we cited the evidence in our brief, that the marketers and Ms. Javidan were co-conspirators, as was Mr. Shahab. So now that leaves three examples of claimed error here. One of them, we conceded that there was error. It was with respect to testimony from Mr. Shahab about conversations with folks at Patient Choice about who was completing the revisit notes. We conceded error there. To be clear, we didn't concede that there was a problem with it. Reversible error. No, we did not concede reversible error here, and the concession we made was that the statement was made in furtherance of a separate conspiracy, and indeed that was the case with respect to this particular example, though we note, as we noted in our brief, whether this court reviews for plain error or harmless error, there is simply no way that that limited, very isolated piece of testimony would have had any effect on the outcome of the verdict, especially given the substantial evidence that Ms. Javedan knew that a cure was operating on the basis of fraudulently completed patient revisit notes. Now this leaves... Thank you. Yes, ma'am. Yes, Your Honor. Go ahead and finish that, because I have another question. I was just going to say, with respect to the last two examples of claimed co-conspirator exception error, these are conversations that Mr. Shahab had with Dr. Raval and Dr. Ali. There is no doubt here that Dr. Raval and Dr. Ali were co-conspirators of Ms. Javedan. She paid them both for patients. Again, the concession that we made here, to the extent it was a concession at all, was that the conversation was not obviously in furtherance of the accurate conspiracy. If this court accepts our argument that this is reviewed for plain error, then the ambiguity in the record actually means that Ms. Javedan cannot show clear, obvious error. If the court concludes that harmless error review applies, I think the court would then look... would apply the more probable than not standard. And I think it's clear that, given the weight of the evidence that was introduced in this case, that had that testimony not come in, the outcome of the verdict would have... the outcome of the trial would have still been the same. Okay. I now want to go back to the issue raised by Ms. Robinson on behalf of Mr. Maida, and that is the one conspiracy or two. I know the government argues that there were two separate conspiracies. Counsel for Mr. Maida has argued that there was really only one, and that you're basically sort of stretching to make two, because these things occurred in a common place, common parties. I want you to address the one versus two. Of course, Your Honor. This is the five-factor Cedido test here, and we did concede that the defendant was charged under the same statute, though that carries, I think, minimal relevance here, and the place consideration. The other three considerations, I think, weigh in favor fairly heavily of separate conspiracies. And the first is, although there was, and we don't dispute this, there was considerable overlap between... if you look at all the individuals involved in the Shahab conspiracy and in the Pace and Choice All-American conspiracy and the Akir conspiracy. As the Fifth Circuit said in Almazen, when the key figures in the conspiracies are different or perform different functions, that that factor tilts in favor of separate conspiracies. That's exactly what we have here. We have it with respect to two individuals primarily. One is, of course, with Ms. Javedan, who was a key figure at Akir, a part owner, ran the daily operations, did the hiring and firing, was the final decision-maker with respect to Medicare, paid marketers and patients... paid marketers and doctors, and in one instance, paid a patient. She was a key figure. And in that respect, going to Dajjadji's question, the raid happened September 17, 2009. September? September 17, 2009. At that point in time, Ms. Javedan and Mr. Shahab separate even further. Ms. Javedan continues to run the Akir conspiracy for another 14 months until November of 2010. And Ms. Javedan was not a co-conspirator in the first conspiracy, charged or otherwise. And so that's one key difference. The other is the role that Mr. Shahab played. He was a key figure in the first conspiracy and was substantially less involved at Akir. He testified that he did not supervise Ms. Javedan,  He didn't have a key to Akir's office. He didn't have signature authority on Akir's bank account. The plan all along was for Ms. Javedan to be the one who was in charge of Akir. And so I think that's a key difference here. And indeed, one of the things that Ms. Javedan did in her role running Akir was in fact to hire Mr. Mehta to work for her at Akir. So Mr. Mehta started working for Patient Choice and All-American in May of 2009. He then at some point throughout the summer there stopped working at All-American, kept working at Patient Choice, until Ms. Javedan hired him to come work for her at this separate new company from what was at issue in the first case. And was that before the raid on September 17th? That was about six... Yes, it was before the raid. Okay, and so at that point, was he no longer working for AA and CP or PC? He was working for Patient Choice and Akir for that roughly four-to-six-week period of overlap, during which time... He was hired at Akir in August of 2009. He was still at Patient Choice. Then the Patient Choice-All-American conspiracy ends September 17th, 2009. And so that's the four-to-six-week overlap here that we think is relevant, shifting to the time factor under Sanito, that it's a four-to-six-week period of overlap that's relevant. Okay, she hired him in August. That's correct, Your Honor. And he was still... He had this four-to-six weeks where he was, in effect, working for all three of these companies. I believe the record would show that he was working for Patient Choice and for Akir. Akir. And I think, you know, you really do look at Mr. Mita's involvement here, and I think the Fifth Circuit's decision in Jones is very instructive on that regard, and this is cited in our brief. In Jones, and the Fifth Circuit applies... I think it's exactly the same five-factor test that this Court applies. And in Jones, the Fifth Circuit said, if you just look at the conspiracies, you look at the dates charged in the indictment, you'd have considerable overlap. But when you look at the defendant's involvement there in Jones, there was no overlap, and the Court said, therefore, that factor tilts in favor of separate conspiracies. I think the same holds true here with respect to this minimal, at most, four-to-six-week period of overlap. One of the other double jeopardy claims or arguments that Mr. Mita raises, and he raises it, I think, most clearly in reply, is this notion that the conspiracies were interdependent, they were dependent on one another for their success. And I think that's wrong, and I think the most obvious reason that that's wrong is because the Akir conspiracy lasted, on its own, for a full 14 months beyond the end of the Patient Choice All-American conspiracy. Mr. Mita cites some evidence that 63% of the money that Akir received from Medicare was for patients that had been previously cycled through Patient Choice and All-American. That doesn't show that the Akir conspiracy was dependent upon the success of Patient Choice and All-American. In the first instance, it means that more than one-third of Akir's business was entirely separate in that respect. And in any event, the beneficiaries here, the lifeblood of these conspiracies, had Patient Choice and All-American never existed, Akir would have just found these beneficiaries on their own and used them as the basis for submitting fraudulent claims to Medicare. And so I think those are the key points on the double jeopardy analysis. I think the application of those factors fairly sharply tilts in favor of separate conspiracies. I just want to make one final point, and it relates to going back to this co-conspirator exception. Ms. Javidon says in her reply brief that because there is a confrontation clause overlay to hearsay issues, that this is a constitutional issue, and so the constitutional harmlessness beyond a reasonable doubt standard controls. Again, we think that this claim is subject to review for plain error, but to the extent this Court concludes otherwise, this is not a constitutional claim. There was never a confrontation clause issue raised either in the District Court nor in this Court, and indeed there could not have been, because the confrontation clause applies only to statements that are testimonial in nature, and these out-of-court conversations between Mr. Shahab and his co-conspirators at these other conspiracies are manifestly not testimonial statements. And so it is the non-constitutional, more probable-than-not standard that's going to apply, again, if this Court elects to apply harmless error review. With that, I'm happy to answer any other questions of the Court. Otherwise, the government would rest on its briefs with respect to the remaining issues. Apparently there are none. Thank you. Mr. Goldstein. Your Honors, counsel for the government is correct that the raid occurred in late 2009 in September, leaving just a little bit over a year from the time that that scheme of patient choice ended and a cure scheme came to an end. What I would point out, however, is that it's no surprise, or it's not a novel concept, that particular players in any given conspiracy can change over the course of time. The way the conspiracy is executed can change over the course of time. That doesn't change the essential nature of the agreement. And, in fact, in United States v. Hughes, which is cited in our brief, this Court said that it's not necessary for each conspirator to participate in every phase of the criminal venture, provided that there is assent to contribute to the common enterprise. And that certainly is the case here for Mohammad Shahab. His failure to participate actively after the other enterprises had been shut down does not at all alter the nature of the agreement that existed in this case. And so I don't think it's particularly relevant that he wasn't a major player after 2009 in a cure. The other thing is that Jones, that was cited by the government, I think is distinguishable for a very important reason. In that case, there was really very little evidence that the two companies involved had the same central players. And looking at page 582 of that decision, it's very clear that the key players and the two companies at issue there were really mutually exclusive. One did not participate in the acts of the other, and that's certainly not the case here, obviously, where Shahab was the continuing player, the overarching figure, the unifying force behind the conspiracy. Unless your honors have any other questions, I will rest on my brief as to the remaining issues. Okay, thanks. Ms. Robinson. Thank you, your honors. Mr. Goldman did a very masterful job of explaining why the proposed testimony of Sassan Koubiary was not hearsay. The way that Mr. Goldman framed it was that the testimony was offered to show that, in fact, the attorneys gave this advice. That's a non-hearsay purpose. Where a statement is offered to show that it was made for the effect on the hearer, that's not hearsay. It's almost black-letter law. In fact, this testimony was not even offered to show that what Mr. Koubiary said to Ms. Javedan was true. Even if he was only telling her what he thought was said and the advice that he believed had been given, it still has the same effect on her. And to the extent even that it was offered for the truth of what Mr. Koubiary said, we cited cases in the reply brief to show that what he testifies to regarding his own out-of-court statements cannot be hearsay in any event. Now, the government... I just want to briefly discuss one of the government's that Ms. Javedan made use of this on summation and said, well, we know Mr. Koubiary's perspective about the meeting. Now, that argument on summation was based on Ms. Javedan's testimony, not Ms. Koubiary's. And I think that the jury would be invited to stop and say, hmm, when Ms. Javedan's counsel says, well, we know Mr. Koubiary's perspective, but on the other hand, Mr. Koubiary had been on the stand and he didn't talk about that perspective. The jury would... it would be very natural for the jury to wonder, if that's his perspective, how come we're only hearing it from Ms. Javedan? How come we didn't hear it from him? And I think that argument may have actually accentuated the prejudice that was caused by the refusal to admit this testimony in what is a very closely balanced case. The government says that there was a lot of evidence that Ms. Javedan knew what was going on in a cure, but she also put on a good deal of evidence that she didn't. And finally, I would submit that this evidentiary error regarding Mr. Koubiary's testimony is not to be considered alone. It has to be considered in terms of its cumulative impact with the other evidentiary errors regarding the co-conspirator statements, which include errors that the government acknowledges, and that the impact of that, as I discussed before, was not the specific content of the testimony itself, so much as the fact that the jury was told and given to understand that declarations made by these doctors and by other co-conspirators of Mr. Shahab before anything ever started happening with ACCURE were co-conspirator declarations as to Ms. Javedan, and the implications of that, again, were profound. Your Honors, I'm out of time, so at this point I will rest on the briefs. Thank you. Okay. Thank you, Mr. Edelstein. And thanks to all three of you, Mr. Goldman, Ms. Robinson, and of course Mr. Edelstein, for your arguments today. The case will be submitted.